**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0141n.06
Filed: February 18, 2009

**No. 07-3578**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE |
| | ) | NORTHERN DISTRICT OF |
| LOUIS JEMISON, | ) | OHIO |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE: SUHRHEINRICH, GILMAN, and WHITE, Circuit Judges.

WHITE, Circuit Judge. Appellant Louis Jemison was convicted of violating 21 U.S.C. §§ 841(a)(1) and (b)(1)(B) (possession with intent to distribute cocaine and cocaine base), and 21 U.S.C. § 922(g)(1) (felon in possession of ammunition). On appeal, Jemison challenges the district court's denial of his motions to suppress evidence recovered at his arrest and his statement to police, and to dismiss for violation of the Speedy Trial Act. In addition, Jemison asserts that the district court made several evidentiary errors at trial and erred when it denied his motion for judgment of acquittal. Finally, Jemison challenges his sentence. We AFFIRM.

I.

Cleveland Police Officer Matthew Slatkovsky testified that on June 23, 2006, at about 5:00 p.m., he was in his patrol car when he heard loud music coming from an approaching vehicle. Slatkovsky directed the driver of the vehicle, Louis Jemison, to pull over and asked him for his driver's license. When Jemison reached into the center console, Slatkovsky saw a semi-automatic handgun inside. Jemison produced a suspended driver's license, and told Slatkovsky that he had paperwork allowing him to drive, but he was unable to find it. Based on the observation of what he believed was a handgun and Jemison's suspended driver's license, Slatkovsky placed Jemison under arrest, put him in the back of his police car, and advised him of his *Miranda* rights. When Slatkovsky retrieved the handgun from the console of Jemison's car, he found a plastic bag containing pills of unknown origin. Slatkovsky decided to tow the vehicle, and during an inventory of the car, discovered an illegal 600-watt amplifier and a zipped bag in the trunk. Slatkovsky opened the zipped bag, and found that it contained seven bags of powder cocaine and one bag of cocaine base. Slatkovsky issued a citation to Jemison for violating Cleveland City Ordinance § 683.02,[1] read him his *Miranda* rights, and transported him to the police station.

Jemison testified to a different version of events, and claims that his music was not loud, and that he "was actually talking on the cell phone when [he] was pulled over." Jemison also asserts that

---

[1]Cleveland City Ordinance § 683.02 states that "[n]o person shall play any radio, music player, or audio system in a motor vehicle at such volume as to disturb the quiet, comfort or repose of other persons or at a volume which is plainly audible to persons other than the occupants of said vehicle."

he presented Slatkovsky with proof of his driving privileges, and that he never opened the center console in Slatkovsky's presence.

Two days after Jemison was arrested, on June 25th, at 9:00 a.m., Cleveland Detective Elbin Negron interviewed Jemison while he was in custody. Negron advised Jemison of his *Miranda* rights, and Jemison said that he understood his rights and wanted to talk. According to Negron, when he told Jemison that more than a kilogram of cocaine was recovered from his trunk, Jemison "looked down at the table . . . stated it wasn't a kilo," and then looked Negron "directly in the eye and said it's close."

In July 2006, a Cuyahoga County grand jury returned an indictment against Jemison in an Ohio state court. One month later, on August 22, an indictment was filed in the Northern District of Ohio, charging Jemison with two counts of violating 21 U.S.C. § 841(a)(1) and (b)(1)(B) (knowingly and intentionally possessing with intent to distribute 500 grams or more of cocaine and 5 grams or more of cocaine base) and one count of violating 18 U.S.C. § 922(g)(1) (felon in possession of ammunition).

Jemison filed a motion to dismiss based on a speedy trial violation and a motion to suppress the evidence recovered from his car and the statement he made to Negron. The district court denied Jemison's motions, and a jury trial began on February 12, 2007.

At trial, in addition to the testimony of Slatkovsky and Negron, the government presented three expert witnesses: Drug Enforcement Administration (DEA) Agent John Clayton, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Agent Larry Brock, and Nicole Pride from the

Cleveland Police Department's Forensic Laboratory. Clayton testified concerning the difference between cocaine and cocaine base, the "weights and sizes that cocaine is distributed in," the street value and the wholesale value of cocaine and cocaine base, typical packaging of both drugs, and "common characteristics" of individuals trafficking in narcotics, including whether they carry firearms and what types of vehicles they drive. Brock testified that the ammunition recovered from Jemison was manufactured outside of Ohio. Pride testified about the chemical tests she performed on the controlled substances recovered from Jemison's trunk to determine that they contained cocaine and cocaine base.

At the close of the prosecution's case, Jemison moved for judgment of acquittal, which the court denied. The jury returned a verdict of guilt on all three counts, and Jemison filed a motion for new trial, or in the alternative, judgment of acquittal, which the court also denied. The district court sentenced Jemison to 240 months' imprisonment for the drug charges, and 120 months for possession of ammunition, to be served concurrently.

Jemison filed a timely appeal of his conviction and sentence, and asserts that the district court erred when it (1) denied his motion to suppress, (2) determined that the United States did not violate his rights under the Speedy Trial Act, (3) allowed Agent Clayton to testify as an expert witness, (4) committed several evidentiary errors that together constituted cumulative error requiring that the jury verdict be set aside, (5) denied his motion for judgment of acquittal, (6) failed to adequately address his objections at sentencing, and (7) improperly enhanced Jemison's sentence based on a prior drug-trafficking conviction.

II.

Jemison filed a compound motion to suppress before the district court. He sought (1) to suppress the evidence recovered from his vehicle on the ground that Slatkovsky lacked probable cause for the stop and search, and (2) to suppress the incriminating statement Jemison made to Detective Negron, on the ground that Negron's interview violated Jemison's *Miranda* rights. The district court rejected the motion in its entirety, and Jemison challenges both rulings on appeal.

A district court's denial of a motion to suppress is reviewed by this court for clear error with respect to that court's findings of fact, and *de novo* with respect to conclusions of law. *United States v. Miggins*, 302 F.3d 384, 397 (6th Cir. 2002) (citing *United States v. Bradshaw*, 102 F.3d 204, 209 (6th Cir. 1996)). In reviewing the district court's findings of fact, this court considers the evidence in the light most favorable to the government. *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999). "In addition, this court must give deference to the district court's assessment of credibility inasmuch as the court was in the best position to make such a determination." *Id.* at 264-65.

A.

Jemison contends that Slatkovsky stopped his vehicle without probable cause. The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Temporary detention of individuals during the stop of an automobile by the police constitutes a "seizure" of "persons" within the meaning of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809-810 (1996). Thus, the stop of a vehicle by police must not be "unreasonable" under the circumstances. *Id.* at 810. "As a general

matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Id*.

Jemison argues that Slatkovsky's stop of his vehicle was unreasonable because "he had committed no offense and he was allegedly stopped for having 'loud music' in his vehicle. Defendant alleges this was not an offense." Jemison further asserts that Slatkovsky "could not point to the law for the ticket he issued this vehicle," and contends that this court's decision in *United States v. Goodwin*, 202 F.3d 270 (6th Cir. 2000) (unpublished), supports reversal on that basis. In *Goodwin*, the police officer conducted a traffic stop because the defendant "blocked a public roadway." However, the officer revealed that he "failed to issue Defendant a traffic citation for this alleged infraction and was not able to identify any local ordinance or Kentucky statute to support his contention that Defendant was engaged in a traffic violation at the time of the stop." 202 F.3d 270, *3. This court found that the evidence recovered from the stop should have been suppressed.

The record belies Jemison's contentions, and supports both that Slatkovsky stopped Jemison after observing him violate a valid city ordinance and that Slatkovsky identified the ordinance at the time of the stop and at the suppression hearing. Section 683.02 of the Codified Ordinances of Cleveland prohibits playing "music . . . in a motor vehicle. . . at a volume which is plainly audible to persons other than the occupants of said vehicle." During his testimony at the suppression hearing, Slatkovsky explained that music that "is clearly audible to any person outside of the auto" violates the ordinance. Jemison did not challenge the constitutionality of §683.02 at trial, nor has he

challenged it directly in this court.[2] Slatkovsky further testified that he "heard the vehicle before [he] actually saw the vehicle," and the "noise got louder as the vehicle eventually got closer to the area that [he] was in," that the music "was clearly audible to me, well distance away in a residential neighborhood," and that there was "extremely heavy bass coming from the auto in question." Slatkovsky identified the ordinance at the time of the stop by giving Jemison a written citation, and he so testified at the hearing.[3]

Thus, Officer Slatkovsky had probable cause to believe that Jemison was violating Cleveland City Ordinance § 683.02, and the district court did not err in rejecting Jemison's argument that the stop was unreasonable.

B.

Jemison also asserts that Slatkovsky's search of the zipped bag he recovered from Jemison's trunk was constitutionally impermissible. A recognized exception to Fourth Amendment's prohibition against warrantless searches permits law enforcement officers to conduct inventory

---

[2]In *Gaughan v. City of Cleveland*, 212 F. App'x 405, 2007 WL 29175 (6th Cir. 2007) (unpublished), this court recently upheld the constitutionality of Cleveland City Ordinance §683.01(a) — a provision similar to the ordinance in question — which states:

> (a) No person shall play any radio, music player, television, audio system or musical instrument in such a manner or at such volume as to annoy or disturb the quiet, comfort or repose of neighboring inhabitants or at a volume which is plainly audible to persons other than those who are in the room in which such device or instrument is played and who are voluntary listeners thereto.

This court found that § 683.01(a) was not facially impermissibly vague, nor vague as applied to the plaintiff in that case.

[3]During the suppression hearing, Slatkovsky stated: "On that day in question, I issued the violation because I believe he was in violation of 683.02 city ordinance for noise in a vehicle."

searches, including the contents of closed containers, so long as they do so pursuant to standardized procedures. *Florida v. Wells*, 495 U.S. 1, 4 (1990). "This exception recognizes that in addition to investigating crime, officers have an established caretaking role vis-à-vis the public." *United States v. Tackett*, 486 F.3d 230, 232 (6th Cir. 2007). Inventory searches allow police departments to protect property from theft or damage, prevent property disputes from arising, and mitigate safety risks that are inherent when police officers take possession of unknown items. *Id.*

Police officers "do not enjoy their accustomed discretion" when conducting inventory searches, *Tackett*, 486 F.3d at 232, but they may "be allowed sufficient latitude to determine whether a particular container should or should not be opened in light of the nature of the search and characteristics of the container itself." *Wells,* 495 U.S. at 4. "The allowance of the exercise of judgment based on concerns related to the purposes of an inventory search does not violate the Fourth Amendment." *Id*.

Here, after putting Jemison under arrest and placing him in the back of his patrol car, Slatkovsky searched the vehicle "to inventory the property in connection with the tow." In the trunk of the vehicle, Slatkovsky discovered a black zippered bag, which he opened. Inside the bag were seven plastic bags containing cocaine and one bag of cocaine base. At the suppression hearing, Slatkovsky was asked if it is "Cleveland Police Department policy to open bags or containers found within cars during inventory search?" and he answered, "[a]s long as they're not locked in a locked container."

On appeal, Jemison claims that the zipped bag was a locked container, but provides no evidence indicating that force was required to open the bag, or that a lock was present. *See Wells*, 495 U.S. at 2. Next, Jemison argues that it is unclear what the Cleveland Police Department's inventory policy was regarding closed containers, and that Slatkovsky's search of the bag was not done in accordance with policy. Jemison does not present evidence of a departmental policy in conflict with Slatkovsky's actions and testimony; rather, he argues that the government was required to present evidence of the standardized criteria used in the inventory, and that the failure to present the policy renders the search invalid.

The government contends that this portion of Jemison's argument — that search of the zippered bag exceeded departmental policy — was not raised below, and thus, that this court should review under the plain-error standard. Indeed, Jemison's motion before the district court stated only: "The police, in this case, not only searched the interior of the vehicle but opened the trunk to the vehicle. Inside the trunk was a closed container. This was searched without a warrant." In his motion and at the suppression hearing, Jemison did not raise the issue of the departmental inventory policy, nor did he question Slatkovsky about whether the departmental policy authorized opening closed, or zipped, containers. We thus review for plain error.

Jemison asserts that "there was no production of any written mandatory policy," but Jemison never requested the production of the applicable inventory-search policy. Further, in *Tackett*, this court stated that "[w]hether a police department maintains a written policy is not determinative, where testimony establishes the existence and contours of the policy." 486 F.3d at 232. This court

concluded that "the evidence sufficiently supported the existence of an inventory policy," and the conclusion in Jemison's case must be the same. Slatkovsky testified that after he decided to tow the vehicle, he conducted an inventory search pursuant to departmental policy to "protect citizens' rights, to protect the property rights of the owner of the auto, also protect the Division of Police for any possible litigation that may come out of something coming up missing." In addition, he stated that it was department policy to search closed, unlocked containers. Accordingly, the district court did not err in denying Jemison's motion to suppress the evidence recovered from the inventory.

C.

Jemison argues that the district court should have suppressed his statement to Officer Negron as taken in violation of his *Miranda* rights. As a general rule, when a defendant is in custody, police officers must give *Miranda* warnings before interrogation begins; otherwise, any statements resulting from the interrogation will be inadmissible unless the defendant clearly and intelligently waived his rights. *Miranda v. Arizona*, 384 U.S. 436 (1966). Interrogation is defined as "questioning initiated by law enforcement officials." *Id*. at 444. In *Rhode Island v. Innis*, the Supreme Court further explained that interrogation is questioning by the police that is reasonably likely to elicit an incriminating response. 446 U.S. 291, 301 (1980). Routine inquiries made only to secure biographical information in order to complete booking do not constitute interrogation. *Pennsylvania v. Muniz*, 496 U.S. 582, 584 (1990).

Here, it is uncontested that Negron's interview of Jemison constituted an interrogation, and that Negron informed Jemison of his *Miranda* rights before questioning him. Jemison argues that

the interrogation still violated his *Miranda* rights because he had previously invoked his right to remain silent after Slatkovsky informed him of his rights at the time of his arrest. What Jemison does not acknowledge, however, is that there is no evidence in the record that he invoked his rights at any point. Rather, the record supports that Slatkovsky informed him of his rights and then did not attempt to question him further. Jemison fails to provide any authority suggesting that mere silence after receiving *Miranda* rights constitutes an invocation of the right to remain silent, where the defendant was not interrogated. The district court did not err when it denied Jemison's motion to suppress his incriminating statement.

III.

Jemison claims that the district court violated his rights under the Speedy Trial Act, 18 U.S.C. § 3161 *et seq*. This court reviews a district court's application of the Speedy Trial Act *de novo*. *United States v. Gardner*, 488 F.3d 700, 717 (6th Cir. 2007).

The Speedy Trial Act requires that a defendant be formally charged within thirty days of his arrest. 18 U.S.C. § 3161(b).[4] Jemison claims that the government violated 18 U.S.C. § 3161(b) by impermissibly waiting to indict him, as he was arrested on June 23, 2006 by the Cleveland Police Department, but not indicted in federal court until August 22, 2006, outside of the thirty-day time period imposed by 18 U.S.C. § 3161(b).

---

[4]18 U.S.C. § 3161(b) mandates that "[a]ny information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges."

However, contrary to Jemison's argument, the thirty-day arrest-to-indictment clock in 18 U.S.C. § 3161(b) "is not triggered until there is a federal 'arrest.'" *United States v. Murphy*, 241 F.3d 447, 454 (6th Cir. 2001); *United States v. Blackmon*, 874 F.2d 378, 381 (6th Cir. 1989) ("A defendant is not 'arrested' for purposes of the Speedy Trial Act until formal federal charges are pending"). Jemison's June 23rd arrest was not a federal arrest; therefore, the thirty-day clock did not begin to run.

Jemison further argues, relying on *United States v. Benitez*, 34 F.3d 1489, 1494 (9th Cir. 1994), that dismissal was warranted because the government manipulated the proceedings in order to avoid the constraints of the Speedy Trial Act. In *Benitez*, the Ninth Circuit found that repeated contact between the state prosecuting attorneys and federal attorneys "combined with the state's dismissal of the first complaint and filing of a new complaint" were suspicious, and ultimately found that the state prosecution was not in good faith. *Id.* at 1494-95. The court explained:

> The Speedy Trial Act would lose all force if federal criminal authorities could arrange with state authorities to have the state authorities detain a defendant until federal authorities are ready to file criminal charges. For this reason, Speedy Trial Act time periods may be triggered by state detentions that are merely a ruse to detain the defendant solely for the purpose of bypassing the requirements of the Act.

*Id.* In Jemison's case, however, there is no evidence to suggest that the prosecution was manipulating the system to avoid compliance with the Speedy Trial Act. Jemison was originally arrested by state officials, and a state indictment was filed that was still pending at the time Jemison was sentenced on the federal charges. Thus, the district court did not err when it denied Jemison's Speedy Trial motion.

- 12 -

IV.

Jemison argues that the district court erred when it allowed DEA Agent Clayton to provide

expert testimony where: (1) the government failed to provide the defense with a Rule 16(a)(1)(G)

expert disclosure, and (2) Clayton's testimony was "improper and inflammatory."

A.

Jemison did not object at trial to the government's purported failure to provide him with Rule

16(a)(1)(G) notice regarding Agent Clayton's expert testimony. This court reviews issues involving

the admissibility of expert testimony for plain error where no objection was made at trial. *United*

*States v. Johnson*, 488 F.3d 690, 697 (6th Cir. 2007). Under this standard, Jemison must demonstrate

(1) error (2) that was plain and (3) that affected his substantial rights and (4) seriously affected the

fairness, integrity, or public reputation of judicial proceedings. *Id.* "Whether the trial court

committed plain error always depends on the specific facts of the case at hand." *United States v.*

*Martin*, 520 F.3d 656, 658 (6th Cir. 2008).

Jemison contends that the government failed to provide him with an expert witness disclosure

required by Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure.[5] However, in its response

---

[5]Rule 16(a)(1)(G) provides that:

> At the defendant's request, the government must give to the defendant a written
> summary of any testimony that the government intends to use under Rules 702,
> 703 or 705 of the Federal Rules of Evidence during its case-in-chief. . . .The
> summary provided under this subparagraph must describe the witness's opinions,
> the bases and reasons for those opinions, and the witness's qualifications.

to Jemison's appeal brief, the government provided a letter dated February 9, 2007,[6] from the

assistant U.S. Attorney to defense counsel, providing notice pursuant to Rule 16(a)(1)(G) that the

government intended to call Agent Clayton. Jemison has not challenged the authenticity of this letter.

The letter also informed Jemison that the government planned to call Nicole Pride and Larry Brock,

the two other expert witnesses called by the government at trial, but Jemison does not allege that the

government failed to provide him with notice that Pride and Brock would testify. Jemison has not

shown clear error.

B.

Jemison next claims that the district court erred when it allowed Clayton to testify about drug

trafficking although Clayton was not present during Jemison's arrest. Jemison contends that

Clayton's expert testimony was improper and inflammatory.

This court reviews "for abuse of discretion a district court's evidentiary rulings, including

rulings on witness testimony under Rules 701 and 702 of the Federal Rules of Evidence." *United

States v. White*, 492 F.3d 380, 398 (6th Cir. 2007). Reversal is appropriate only where the district

---

If the government does not disclose the summary, Rule 16(d)(2) authorizes the district court to prohibit the government from introducing the undisclosed testimony, or to make such other order as is just under the circumstances.

[6]Trial in this case began on February 12, 2007, and Clayton testified on February 13. Because Jemison does not acknowledge that he received this letter, he does not argue that the notice was untimely. Unhelpfully, Rule 16(a)(1)(G) does not specify *when* the government must produce the summary, e.g., a certain number of days after the defendant's request, before the trial starts, or before the expert testifies. While Jemison might possibly have had a valid argument that the notice provided by the government was untimely, he made no objection at trial. Thus, in order to succeed on appeal he must show plain error, which he is unable to do.

court's erroneous admission of evidence affects a substantial right of the party, and an error affects a defendant's substantial rights if it is likely to have had any substantial effect on his conviction. *Id* at 398, 404.

Clayton testified that he has been with the DEA since 1981, and his primary job responsibility is to conduct narcotics investigations. He testified that he received extensive training over the past 15 to 20 years on financial investigation, drug manufacturing, different types of drugs, and complex conspiracy investigations. He testified that he has taken "classes probably every single year for the past 15 or 20 years," has been involved in "well over 500 to 1,000 different cases involving buying or selling drugs," and has "sold coke, crack . . . bought coke . . . bought crack, sold heroin . . . bought them all and sold them all in this capacity."

At Jemison's trial, Clayton provided opinion testimony on the difference between cocaine and cocaine base, how cocaine is distributed, and the difference between "street value" and "wholesale value" for cocaine. Jemison's objections were overruled by the district court. The government then asked Clayton to examine the bags of cocaine recovered from Jemison's vehicle, and Clayton identified them as "seven individual bags, all weighing approximately 125 grams" of cocaine. Clayton opined that each bag would sell for $3,200 to $3,600. Clayton also testified about cocaine base and how it is distributed, whether it is common for a user to possess a large amount of cocaine base, and the street value of 36 grams of cocaine base (about $2,000).

Clayton was then asked for "the common characteristics" of "an individual distributing cocaine and crack cocaine." Clayton stated that a drug dealer will often have two vehicles, "a high-

end vehicle" to "show he's who everybody wants to approach to buy cocaine," and a "low-end vehicle . . . to use so when he's selling it, police don't look at him twice because they don't recognize . . . him as a high-profile individual making money in the ghetto. . . ." Clayton stated that drug dealers often have

> multiple cellular phones, different telephone numbers, to enable you to contact people various ways and various times with various phones and no one can figure out who's calling. Those phones will be in various individuals' names other than your own. The vehicle you drive won't be in your name. You'll have cash. You'll have a scale somewhere. You'll have access to property that's not yours or that is in somebody else's name so you can then go process your cocaine and your crack, which means put it in different bags, to cook the cocaine base, places to weigh it, to prepare your sale so when you then get a phone call from one of your distributors, you can just respond in whichever vehicle you want, make a quick sale, and respond to the secondary location.
>
> Places you store your money at, people notoriously always keep their money where they sleep, because they don't trust anybody. They keep their cocaine generally where they are, they sleep, unless they've established a good secondary location and in somebody's else name that they know is secure.
>
> Those are primary, the basic things that most narcotic traffickers do.

Clayton also explained that it is common for drug dealers to carry firearms because "it's getting more and more violent."

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court held that Rule 702 places a special obligation on the trial court to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. Although *Daubert* was restricted by its facts to scientific testimony, this court has applied the *Daubert* standard to law enforcement agents testifying as experts on drug trafficking, *United States*

*v. Lopez-Medina,* 461 F.3d 724, 742 (6th Cir. 2006), and has consistently "found police officers' expert testimony admissible where it will aid the jury's understanding of an area, such as drug dealing, not within the experience of the average juror." *United States v. Thomas*, 74 F.3d 676, 682 (6th Cir. 1996). Courts generally have permitted police officers to testify as experts regarding drug trafficking as long as the testimony is relevant and reliable. *United States v. Johnson*, 488 F.3d 690, 697 (6th Cir. 2007). The Sixth Circuit "regularly allows qualified law enforcement personnel to testify on characteristics of criminal activity, as long as appropriate cautionary instructions are given, since knowledge of such activity is generally beyond the average layman." *United States v. Swafford*, 385 F.3d 1026, 1030 (6th Cir. 2004).

Jemison claims that Clayton's testimony was "improper and inflammatory." Under Rule 702, a person with "specialized knowledge," qualified by his or her "knowledge, skill, experience, training, or education," may give opinion testimony if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Clayton's twenty-six years of experience with narcotics investigation qualified him to provide opinion testimony regarding the price, packaging, and distribution of cocaine and cocaine base. This testimony was relevant to the issue of whether Jemison possessed the drugs with the intent to distribute them.

However, Clayton's testimony regarding common behaviors of drug dealers — e.g., a tendency to possess both a "high-end" and a "low-end" vehicle — does not appear to be relevant to Jemison's case. While Jemison was arrested in a "high-end vehicle," the government did not present any evidence that he possessed a "low-end vehicle" or that he displayed any of the other behaviors

Clayton identified, such as possessing multiple cellular phones or having access to multiple properties to package drugs. The district court erred in allowing Clayton to provide this testimony without requiring the government to establish its relevance. The error was, however, harmless in light of the overwhelming evidence of Jemison's guilt (the drugs and ammunition recovered). Even without Clayton's testimony about the "common characteristics" of drug dealers, it is extremely likely that the jury would have found that Jemison possessed the drugs with the intent to distribute, based on the amount and packaging of the drugs.

V.

Jemison argues that several errors related to the testimony of Detective Negron and Nicole Pride had the cumulative effect of denying him due process. "As this Court has held on previous occasions, '[e]rrors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair.'" *United States v. Blackwell*, 459 F.3d 739, 770 (6th Cir. 2006) (quoting *Walker v. Engle,* 703 F.2d 959 (6th Cir. 1983)). Jemison points to the following purported errors: (1) on redirect examination, the district court permitted Detective Negron to read a written statement he recorded after interviewing Jemison; (2) also during Negron's redirect examination, the prosecutor asked Negron an impermissible question about Jemison's personal knowledge; (3) Nicole Pride's testimony about her examination of the drugs was not based on her personal knowledge; and (4) when Pride was leaving the witness stand, the district court said, "good to see you again," which had the effect of improperly enhancing her credibility.

A.

Negron testified about his interview with Jemison and the incriminating statement he made, and explained that immediately after the interview, he drafted a criminal complaint charging Jemison with violating state law. On cross-examination, Jemison's attorney emphasized that the affidavit Negron prepared in support of the complaint included the information provided by Slatkovsky, but did not describe the incriminating statement Negron attributed to Jemison, although the affidavit was prepared immediately after the statement was allegedly made. Defense counsel also questioned Negron about a report he wrote the day after the interview, which included a description of Jemison's incriminating statement. On redirect, and over Jemison's objection, the court permitted Negron to read the paragraph of his report that described Jemison's incriminating statement.

Jemison argues that Negron's report is inadmissible because it is a prior consistent statement, offered to bolster Negron's credibility after Jemison's counsel had discredited him, but not shown to have been made before Negron had a motive to fabricate. *See Tome v. United States*, 513 U.S. 150, 167 (1995). Even if Jemison's contention is meritorious, any error would be harmless. Negron's reading of the report added nothing to the testimony he had given on direct.

B.

Next, Jemison challenges the following part of Negron's testimony on redirect:

| GOVERNMENT: | So when you told him it was over a kilo, and he looks you directly in the eye and says it's close, where was he basing that knowledge? |
| DEFENSE COUNSEL: | Objection. |

COURT:                    Overruled.

NEGRON:                I believe it to be on personal knowledge of the cocaine
in his trunk.

While Negron should not have been permitted to answer the question concerning Jemison's knowledge, his answer was harmless.

C.

Jemison next claims that Nicole Pride's testimony was "improper because it appeared that her analysis [of the drugs] was from reading a machine," rather than from "personal knowledge." Pride testified that she has a bachelor's degree in biology, has completed intensive courses in drug analysis with the DEA, and receives ongoing training from the scientific examiners in the Cleveland Police Forensic Laboratory. She has chemically analyzed substances to determine whether they contain cocaine "thousands of times," and has analyzed substances to see if they have cocaine base "hundreds" of times. Pride explained that she tested the seven plastic bags recovered from Jemison's car by performing a "preliminary Scott's test, which is a color test," where she observed "color change from a pink solution to a blue one once the solution was added." She "also performed an instrumental test on the gas chromatograph spectrometer, in which sample was injected into the GC portion of the instrument, and then bombarded with electrons and compared to standards in the library." She stated that the total weight of the seven bags was 688.37 grams, and that the substance tested positive for cocaine. With the cocaine base recovered from Jemison's vehicle, Pride performed a preliminary Scott's Test as well as a "base test to show that it is in the rock form, which is called crack, instead of the powder form, on an FTIR, a Fourier Transform Infrared Spectrometer." The

substance weighed 36.60 grams, and was positive for cocaine base. Thus, Pride's background information qualified her as an expert witness permitted to give the opinion testimony she provided. Jemison's objection to her testimony is without merit.

D.

As Pride was leaving the witness stand, the district court judge said, "Thank you, Ms. Pride. Good to see you again." Jemison did not object to this statement at trial, but on appeal, claims that this remark improperly enhanced Pride's credibility. Jemison points to this court's holding in *United States v. Michienzi*, where after the government's direct examination of a witness, the district court judge "arose from the bench, went over to the witness stand. . . conducted a conversation with the witness in the presence of the jury," "returned to the bench," and stated that he and the witness were "old friends." 630 F.2d 455, 456-67 (6th Cir. 1980). In *Michienzi*, the defendants' convictions were vacated, but the facts in that case are not at all similar to those here. The most likely inference drawn by the jurors is that Pride had testified before the court on at least one prior occasion, and perhaps with some frequency. Given Pride's preliminary testimony regarding her qualifications, we find no plain error.

Thus, to the extent there was error, it was not of a magnitude to amount to a deprivation of due process because it did not render the trial fundamentally unfair. *United States v. Trujillo*, 376 F.3d 593, 614 (6th Cir. 2004).

VI.

At the close of the government's case, Jemison moved for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. When reviewing the denial of a motion for judgment of

acquittal, this court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This court gives the government the benefit of all inferences that may reasonably be drawn from the evidence. *United States v. Villarce*, 323 F.3d 435, 438 (6th Cir. 2003).

Jemison contends that he was entitled to a judgment of acquittal on the felon in possession of ammunition charge because the government did not prove that the ammunition recovered from his vehicle was "true ammunition."

Jemison cites no authority in support of the underlying premise of his argument — that the government was obliged to establish that the ammunition was live. In any event, Officer Slatkovsky testified that he recovered "nine live rounds," from Jemison's vehicle, and no evidence was presented by the government or Jemison indicating that the bullets were not live.

Jemison also asserts that the government did not establish that his possession of the ammunition was "in or affecting interstate" commerce. However, ATF Agent Brock testified that all nine rounds were manufactured outside of Ohio: four in Minnesota, three in Alabama, one in Idaho and one in Connecticut or Arkansas. Jemison concedes in his brief that "[t]he ammunition at issue had, at some previous time, crossed a state line," and fails to explain why this is insufficient to establish the requisite nexus.

Jemison also contends that Section 922(g)(1) exceeds Congress's authority under the Commerce Clause. U.S. Const. art. 1, § 8, cl. 3. This argument is also without merit, because this court

has explicitly held that a Section 922(g)(1) conviction comports with the commerce clause so long as the defendant "possessed a gun [or ammunition] that previously had moved in interstate commerce." *United States v. Henry*, 429 F.3d 603, 619 (6th Cir. 2005). The government clearly established that the ammunition at issue was manufactured outside of Ohio, and thus, the elements necessary for a Section 922(g)(1) conviction were satisfied.

VII.

Jemison's presentence report (PSR) calculated his guidelines range at 210 to 262 months of imprisonment, based on an offense level of 32 and a criminal history category of VI. The court sentenced Jemison within this range. On appeal, Jemison challenges his sentence as unreasonable and argues that the district court did not adequately consider his arguments that (a) the court had discretion to reduce his sentence based on the disparity in the 100:1 crack/powder cocaine ratio, (b) the court should consider the information he provided to Agent Clayton in imposing his sentence, and (c) that his criminal history category was inaccurate.

In response to Jemison's argument requesting a downward departure based on the 100:1 crack/powder cocaine ratio, the district court stated that "in the Sixth Circuit . . . that's something that is settled, and so there's nothing that – I'm bound to accept what they say regardless of whatever personal opinion I may have." In *Kimbrough v. United States*, 128 S.Ct. 558 (2007), decided after Jemison's sentencing hearing, the Supreme Court held that "it would not be an abuse of discretion for a district court to conclude when sentencing a particular defendant that the crack/powder disparity yields a sentence 'greater than necessary' in light of the purposes of sentencing set forth in [18 U.S.C.]

§ 3553(a)." *Kimbrough*, 128 S.Ct. at 575. However, in Jemison's case, the record reveals that the court was satisfied that a sentence within the guidelines was adequate but not excessive. The court sentenced Jemison to the mid-point of the guideline range, noted his "long list of criminal conduct," and stated that he was at a point where "enough is enough."[7] The district court's belief that it lacked the ability to consider the crack/powder disparity did not affect Jemison's sentence.

At the sentencing hearing, Jemison urged the court to consider that he had offered to cooperate with Agent Clayton. The district court responded that it was informed "during trial or at some point . . . that you did have some positive conversations and contact with Agent Clayton and others. And I'm going to take that into consideration as a positive thing, while I don't think acceptance of responsibility is appropriate." The PSR noted that when the probation officer attempted to interview Jemison in preparation for the report, Jemison declined to be interviewed regarding his actions, and refused to talk with the officer. The district court's refusal to treat Jemison's cooperation as the equivalent of acceptance of responsibility was not an abuse of discretion under these circumstances.

Jemison also challenged his criminal history category at the sentencing hearing. The district court responded that if there were a category higher than VI, Jemison would likely have deserved the higher classification. The PSR awarded Jemison points for his previous convictions: possession of

---

[7]The district court stated:

> I'm going to sentence you within the guidelines because I think that's correct. . . . But the reason is that every time you get out, you sell drugs or you use drugs or you're involved in criminal activity, so at some point they have to say enough is enough, so this is that point.

drugs (twice), making and possessing forged and counterfeit securities, receiving stolen property, theft, and forgery. In addition, several previous convictions did not contribute to his criminal history score; he received no points for his convictions for unauthorized use of a motor vehicle, drug abuse, possession of criminal tools, taking identity, domestic violence, parole violation, and contempt of court. Thus, the district court's conclusion that criminal history category VI was justified based on Jemison's record is without error. Therefore, Jemison's argument that the district court failed to address his objections is without merit.

## VIII.

In his last challenge, Jemison argues that the district court erred when it denied his motion to correct his sentence. In his motion to correct his sentence, Jemison argued that the district court improperly based his sentence on "a superceding information . . . filed on or about January 23, 2007." The superseding information gave notice that the United States planned on relying "upon the previous 'felony drug offense' conviction . . . for the purpose of invoking the increased sentencing provisions of Title 21, § 841(b)."

Jemison was charged with, and convicted of, violating 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B). Section 841(a)(1) makes it unlawful for any person to "knowingly or intentionally . . . possess with intent to . . . distribute a controlled substance." 21 U.S.C. § 841(b)(1)(B) states that for any violation of 841(a) involving 500 grams or more of cocaine or 5 grams or more of cocaine base, there is a statutory mandatory minimum sentence of five to forty years imprisonment. However, a defendant with a "prior conviction for a felony drug offense . . . shall be sentenced to a term of

imprisonment which may not be less than 10 years and not more than life imprisonment." 21 U.S.C. § 841(b)(1)(B).

Jemison argues that his 1999 conviction of trafficking cocaine, for which he received a nine-month sentence, was not a "felony drug offense," and thus, he was not subject to the mandatory minimum imposed by 21 U.S.C. § 841(b)(1)(B) for defendants with prior felony drug convictions. Jemison admits, however, that trafficking cocaine is "punishable between six (6) and eighteen (18) months," but argues that he "was presumptively entitled to a lesser sentence unless the court found that a certain enhancing factor existed." Although § 841(b) does not define the term "felony drug offense," § 802(44) defines it as an offense "punishable by imprisonment for more than one year under any law . . . that prohibits or restricts conduct relating to narcotic drugs . . . ." The use of the word "punishable" rather than "punished" makes clear that "it is not the actual punishment imposed but that which the statute authorizes which determines whether a crime is a felony or a misdemeanor." *Barde v. United States*, 224 F.2d 959, 959 (6th Cir. 1955) (per curiam) (citation and internal quotation marks omitted). Thus, Jemison's argument is without merit, and there is no indication that the district court committed error in sentencing Jemison or in refusing to correct his sentence.

Accordingly, the judgment and sentence of the district court are affirmed.