# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-3950

_____

United States of America

*Plaintiff - Appellee*

v.

Victor Defawn Jones

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Southern District of Iowa - Des Moines

_____

Submitted: September 23, 2016
Filed: December 9, 2016
[Unpublished]

_____

Before RILEY, Chief Judge, MURPHY and SMITH, Circuit Judges.

_____

PER CURIAM.

Victor Defawn Jones appeals his 188-month sentence for possession with intent to distribute 500 grams or more of a mixture or substance containing methamphetamine and 50 grams or more of actual methamphetamine. Jones argues

that the district court[1] erred in (1) calculating his base offense level as 34 based on its drug-quantity finding, and (2) attributing three criminal history points to Jones based on a prior state robbery sentence. We affirm.

## I. *Background*

Jones was arrested at an informant's house following controlled, recorded telephone calls over the course of the prior week between the informant and Jones. Officers had the informant order methamphetamine from Jones. Officers seized two packages of methamphetamine from the room where they arrested Jones. The first package contained six ounces of methamphetamine and was found in Jones's bag. The second package contained one kilogram of methamphetamine and was found in a desk drawer.

Jones pleaded guilty to possession with intent to distribute 500 grams or more of a mixture or substance containing methamphetamine and 50 grams or more of actual methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A). At sentencing, he admitted to possessing with intent to distribute the six-ounce package of methamphetamine but denied possessing the additional kilogram of methamphetamine. He objected to the presentence investigation report's (PSR) inclusion of this amount in the drug-quantity calculation. The PSR had reported 1,074.70 grams of actual methamphetamine based on laboratory analysis.

To establish drug quantity, the government presented the testimony of Officer Anthony Ballantini of the Des Moines Police Department, a six-year veteran of narcotics investigations and the lead investigator in the case. Officer Ballantini testified that he received information from Officer Nicholas Berry of the Tri County Drug Enforcement Task Force following Officer Berry's arrest of Brian Ausborn.

[1]The Honorable John A. Jarvey, Chief Judge, United States District Court for the Southern District of Iowa.

Upon his arrest, Ausborn had in his possession one pound of methamphetamine and over $10,000 in cash. Ausborn identified his methamphetamine source as "Tamari" who lived on Diehl Street in Des Moines, Iowa. Officer Ballantini later identified "Tamari" as Tabari Miller. Officer Berry relayed text messages to Officer Ballantini that he had seen on Ausborn's cell phone between Ausborn and Miller. These text messages showed that Ausborn obtained a two-pound quantity of methamphetamine from Miller in early September 2013 for $32,000. Ausborn once met Miller's source, who Ausborn described as a light-skinned black male of possible Hispanic origin who drove a white truck.

Officer Ballantini obtained a search warrant for Miller's residence. During that search, officers discovered evidence consistent with methamphetamine distribution. Miller cooperated and identified Jones as his source. Miller provided Jones's telephone number to Officer Ballantini and said that Jones drove a black BMW and a white truck. According to Officer Ballantini, the evidence showed that Miller was the middle man for drug transactions between Jones and Ausborn. Officer Ballantini learned from Miller that Miller had been purchasing methamphetamine from Jones since February 2013, "starting off with an ounce or two, moving [his] way up to a pound to two pounds and the latest being a kilo."

Miller subsequently made controlled, recorded telephone calls to Jones. Officer Ballantini was present during those phone calls and instructed Miller "to order the quantity of methamphetamine that he normally ordered from . . . Jones." During these calls, Miller and Jones used code words and never expressly referred to methamphetamine or money. During the first controlled call, Jones asked Miller if he wanted "the full order." According to Officer Ballantini, Jones's reference to the "regular" or "full" order meant two pounds of methamphetamine. During the second controlled call, Miller asked Jones to "try and get me more than that." Officer Ballantini testified that "get[ting] a little more" meant "one kilogram." Jones told

Miller that "Friday I'll be heavy." The plan was for Jones to contact Miller on Thursday, prior to his return to Iowa on Friday.

Officer Ballantini obtained a search warrant to determine the location of Jones's cell phone. As a result, Officer Ballantini learned that Jones's cell phone was located in Katy, Texas. Officers used the location information to track the movements of Jones's cell phone traveling north toward Iowa. After Jones returned to Iowa, on September 27, 2013, an officer saw him stop at a gas station off the interstate. Jones was driving his white truck and pulling an enclosed trailer. The patrol officer stopped Jones for a traffic violation and obtained Jones's consent to search his truck and trailer; however, the vehicle search proved unsuccessful.[2]

Subsequently, Officer Ballantini checked Jones's cell phone location a final time and saw that it was near Miller's residence. Officer Ballantini and Officer Mathis[3] drove to Miller's residence, where they saw Jones standing by his white truck parked in Miller's driveway at 5:46 p.m. Miller was not home. Officers contacted Miller and instructed him to meet with Jones and tell Jones that Miller could not get in touch with Ausborn and that the deal had taken too long and would not happen.

Miller met with Jones at Miller's residence. Miller called Officer Mathis, who was posing as Brian Ausborn. Miller talked to Officer Mathis "about the deal that was supposed to go down earlier in the day," but "Officer Mathis kept explaining to [Miller] that the deal was off." Miller was speaking in code, and the officers had

_____

[2]Officer Ballantini believed that a second vehicle transporting the methamphetamine from Texas to Des Moines was traveling with Jones. This was the manner in which Jones had previously transported drugs. Officers did find three cell phones, two of which Jones let officers look through. On one of these phones, Officer Ballantini saw text messages between Jones and Miller matching the text messages that Miller previously described to Officer Ballantini.

[3]Officer Mathis's first name is not given in the record.

-4-

difficulty understanding what Miller was communicating. After Miller met with Jones, officers followed Miller to a predetermined location; no one followed Jones.

At about 9:00 p.m., Officer Ballantini met with Miller at the predetermined location. Miller explained that "he was trying to tell [the officers] that the drugs were already at the house, that the kilo was there and that it was in the office where the deals normally go down." Additionally, Miller revealed that "Jones had another pound of methamphetamine in his black bag and that he needed a scale to break down the additional pound." After obtaining a scale for Miller to give to Jones, officers then returned to the predetermined location near Miller's residence and had Miller make a recorded phone call to Jones. Miller told Jones "the dude is going to have your money," and Jones replied that he would return in 35 minutes and no longer needed the scale.

Officer Ballantini had "pinged" Jones's phone and learned that he was at a hotel in Des Moines. As a result, one officer went to the hotel to set up surveillance on the white truck located in the parking lot. Another officer conducted surveillance on Miller's residence from a shed near the rear of the residence. Officer Ballantini "pinged" the phone again and noticed that the phone was in the vicinity of Miller's residence, which caught Officer Ballantini by surprise because Jones's white truck was still parked at the hotel. The officer in the shed saw Jones arrive at Miller's residence at 10:15 p.m., approximately 75 minutes after officers had last seen Jones. Jones was driving a black BMW. Jones carried a black bag with handles into Miller's residence.

Officer Ballantini subsequently apprehended Jones at Miller's residence with the methamphetamine during a staged warrant execution. Officer Ballantini discovered Jones near the drugs. He saw "Jones quickly turn and make a motion like he was throwing something." Officer Ballantini found a black bag with handles and the six-ounce quantity of methamphetamine under a desk to the left of the doorway.

The kilogram of methamphetamine, which Miller said that Jones left during an earlier visit, was located in the bottom drawer of that desk. According to lab reports, the two packages of methamphetamine contained a total of 1,074.70 grams of actual methamphetamine.

On another desk in the same room, an officer discovered plastic baggies, a digital scale, and one of Jones's cell phones. Jones had $5,745 in U.S. currency, his wallet, and additional cell phones on his person at the time of his arrest. In Jones's vehicle, officers recovered a bank receipt with Jones's name and address from May 21, 2013, showing an available balance of $11,577.60. They recovered 12 separate $1,000 money bands stamped "July 17, 2013." Officer Ballantini testified that Jones "didn't have an income to support $12,000." Officers also found receipts showing $29,500 in deposits during September 2013. Reviewing bank account records for Jones and his wife, Officer Ballantini discovered five separate deposits of $5,000 or more (totaling at least $25,000) into Jones's wife's bank account in August and September 2013. Both Ausborn and Miller told officers that Jones had been distributing methamphetamine since February 2013, and Officer Ballantini testified that "[c]ash is a common denominator in drug trafficking."

Officer Ballantini testified that the street value of one ounce of methamphetamine in 2013 was "[a]bout $1,500." According to Officer Ballantini, Miller told him that Jones had sold all but six ounces of the one-pound quantity of methamphetamine (ten ounces), which Jones had left at Miller's residence the first time that he visited. Miller told officers that Jones said the cash that he was arrested with ($5,745) came from the earlier sale of methamphetamine. Officer Ballantini testified that ten ounces of methamphetamine would have sold for more than $5,700, and he stated that Jones may have "fronted" methamphetamine distributed earlier. While officers found some U.S. currency during the first search of Jones's truck earlier in the day, they did not find an amount near $5,000. Miller and Ausborn indicated that Jones previously fronted methamphetamine to Miller, who collected

money from Ausborn and then paid Jones. Miller was expected to pay Jones $32,000 for the two pounds of methamphetamine. And the kilogram of methamphetamine that Miller had previously obtained from Jones cost $36,000.

Following Officer Ballantini's testimony, Jones urged the district court to use a base offense level of 30 based upon the six ounces of methamphetamine that Jones admitted to possessing with intent to distribute. But the district court attributed the entire 1,074.70 grams of methamphetamine to Jones. In support of its finding, the district court stated:

> He as the source was independently identified by Mr. Ausborn and Mr. Miller who provided detailed information concerning the source's identity. Add to that the recorded phone calls, the cellphone information, the seizure of the kilo and his cash and the fact that it's consistent with the plan all along lends the court to believe that the government has demonstrated that he was the source for the kilo and that, in addition to the six ounces, is attributable to him.

Based on its drug-quantity finding, the district court calculated a base offense level of 34.

Jones also challenged the three criminal history points that the PSR attributed to him for his prior state robbery sentence. Jones had been sentenced to 25 years in prison for first-degree robbery in Iowa on May 31, 1988. While incarcerated for that offense, Jones committed and pleaded guilty to conspiracy to commit assault with intent to commit a serious injury in violation of Iowa law. Jones was sentenced on March 4, 1997, to serve two years in prison on the conspiracy charge. Pursuant to Iowa Code § 901.8, that sentence was imposed consecutive to Jones's robbery sentence. Jones agreed with the PSR's recitation of the dates that Jones was incarcerated. He challenged only the attribution of criminal history points to the

robbery conviction based upon when Jones's term of incarceration for the robbery was actually discharged.

The Iowa Department of Corrections (IDOC) records show the same release dates for the robbery and conspiracy convictions: work release on November 4, 1999; parole on May 26, 2000; and discharge on March 14, 2002. At sentencing, the probation officer testified that she spoke with a representative from the IDOC who

> stated that because the sentencing for the convictions in paragraphs 32 and 33 were imposed consecutively, there's not a theoretical discharge date for the robbery conviction in paragraph 32. So the defendant's discharge date for both the robbery and conspiracy to commit assault are May 26 of 2000, the date that he was paroled.

After consideration of this information and arguments of the parties, the district court found that the probation office correctly attributed three criminal history points for the robbery conviction. This provided for a total of 12 criminal history points and a criminal history category of V.

The district court, using a base offense level of 34, less two levels for acceptance of responsibility, and a criminal history category of V, identified Jones's advisory Guidelines range as 188 to 235 months' imprisonment. Jones argued for a downward variance to a sentence near 120 months, the statutory minimum. The government requested a five-month upward variance from the advisory Guidelines range, resulting in a sentence of 240 months.

The district court sentenced Jones to 188 months' imprisonment—the bottom of the Guidelines range.

## II. *Discussion*

On appeal, Jones argues that the district court erred in (1) calculating Jones's base offense level as 34 based on its drug-quantity finding of 1,074.70 grams of methamphetamine, and (2) attributing three criminal history points to Jones based on his prior state robbery sentence.

### A. *Drug-Quantity Determination*

Jones argues that the district court's drug-quantity determination was based solely upon Miller's unreliable hearsay. Jones maintains that Miller's statements that Officer Ballantini relayed at trial were not corroborated and that overwhelming evidence refutes the reliability of the statements. According to Jones, the evidence showed that he was going to purchase six ounces of methamphetamine and was not the source of the methamphetamine seized. Jones asserts that if the government wanted to rely on Miller's version of events, it should have offered Miller's sworn testimony at sentencing and permitted Jones's counsel to cross-examine Miller. Jones additionally argues that Ausborn's hearsay statements were insufficient to establish drug quantity because Ausborn never mentioned anything about the one-kilogram package of methamphetamine.

We review for clear error a district court's drug-quantity determination. *United States v. Colbert*, 828 F.3d 718, 729 (8th Cir. 2016). We "revers[e] 'only if the entire record definitely and firmly convinces us that a mistake has been made.'" *Id.* (quoting *United States v. Gonzalez–Rodriguez*, 239 F.3d 948, 953 (8th Cir. 2001)).

Section 6A1.3(a) of the Guidelines provides that

> [w]hen any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor. In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its

admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.

"In determining the relevant facts, sentencing judges are not restricted to information that would be admissible at trial." U.S.S.G. § 6A1.3 cmt. As a result, the court may consider "[a]ny information . . . , so long as it has sufficient indicia of reliability to support its probable accuracy." *Id*. This means that "[r]eliable hearsay evidence may be considered." *Id*. But the court is prohibited from considering "[u]nreliable allegations." *Id*. We have held "that the Guidelines' standard for the consideration of hearsay testimony at sentencing meets the appropriate constitutional test and fulfills the Confrontation Clause's basic purpose of promoting the integrity of the factfinding process." *United States v. Wise*, 976 F.2d 393, 402 (8th Cir. 1992) (citing *White v. Illinois*, 502 U.S. 346, 356–57 (1992)).

"A district court may rely on hearsay evidence for sentencing purposes, as long as it has sufficient indicia of reliability to support its probable accuracy." *United States v. Moralez*, 808 F.3d 362, 368 (8th Cir. 2015) (quotation omitted). "[A] sentence based on hearsay will be sustained if the testimony is reliable enough." *United States v. Tucker*, 286 F.3d 505, 510 (8th Cir. 2002) (citing U.S.S.G. § 6A1.3(a) (2000)). "Testimony by a law enforcement officer regarding statements made by co-defendants may be sufficient to attribute drug quantities to a defendant." *United States v. Alvarez*, 168 F.3d 1084, 1088 (8th Cir. 1999) (citing *United States v. Kenyon*, 7 F.3d 783, 785 (8th Cir. 1993)).

We conclude that Officer Ballantini's testimony regarding statements that Miller and Ausborn made is sufficient to attribute 1,074.70 grams of methamphetamine to Jones. *See id*. First, Ausborn and Miller provided credible information to law enforcement about Jones's identity. Ausborn described Miller's source as a light-skinned black male who drove a white truck. Consistent with

Ausborn's statement, Miller identified Jones as the source of his supply who drove a white truck. Miller also provided law enforcement with Jones's correct telephone number. Law enforcement corroborated this information when it obtained a search warrant to determine Jones's cell phone location and discovered him driving a white truck that ultimately arrived at Miller's residence on September 27, 2013.

Second, Miller and Ausborn provided consistent and credible information concerning drug quantities of methamphetamine. Text messages on Ausborn's cell phone between Ausborn and Miller showed that Ausborn obtained a two-pound quantity of methamphetamine from Miller in early September 2013 for $32,000. Consistent with these text messages, Officer Ballantini learned from Miller that Miller had been purchasing methamphetamine from Jones since February 2013, "starting off with an ounce or two, moving [his] way up to a pound to two pounds and the latest being a kilo." Recorded phone conversations between Miller and Jones corroborated these drug quantities.

Third, the recorded calls also corroborated Miller's and Ausborn's statements that Jones was the source of the supply. In the second recorded call, Miller asked Jones "what's the ticket on that?" Officer Ballantini testified that "what's the ticket on that" means "the listed price for it, for the quantity of drugs." Miller's question to Jones makes no sense if Miller were the source of the supply. Instead, this question demonstrates that Miller was purchasing the drugs from Jones.

Fourth, Jones's actions at the time that law enforcement entered Miller's residence corroborate the information that Miller provided. Jones acted consistently with the plan that he and Miller had made during the recorded telephone calls by showing up at Miller's residence. Miller had told law enforcement that the drug deals with Jones "normally go down" in the office, and he stated that the office is where the kilogram of methamphetamine was that Jones had previously delivered. Miller "also stated that . . . Jones had another pound of methamphetamine in his black bag and that

he needed a scale to break down the additional pound." When Jones arrived for the second time at Miller's residence, the officer hidden in the shed saw Jones carrying a black bag with handles. And, when law enforcement executed the ruse search warrant, Officer Ballantini found Jones "in the office where the drugs were located." Officer Ballantini then observed "Jones quickly turn and make a motion like he was throwing something." Officers subsequently discovered Jones's black bag underneath the desk where the kilogram of methamphetamine was located. The six-ounce baggie of methamphetamine appeared to have fallen out of the black bag. Both the six-ounce baggie and the kilogram of methamphetamine were packaged in the same type of Ziploc baggies with the same color marks.

We thus conclude that the district court did not clearly err in making its drug-quantity determination.

## B. *Criminal History*

Jones also argues that the district court incorrectly determined his criminal history category by counting a sentence that was imposed and completed prior to the 15-year look-back period of U.S.S.G. § 4A1.2(e)(1). According to Jones, in 1988, he was sentenced in Iowa state court for a robbery offense. While incarcerated, Jones was convicted of a separate offense, which extended his period of incarceration by two years. Under applicable Iowa law, Jones asserts that he was required to complete his robbery sentence before he began the two-year sentence, which meant that Jones's robbery sentence ended in May 1998, more than 15 years before the instant offense (September 27, 2013). Jones contends that although the IDOC never marked a theoretical discharge date in 1998 for the robbery sentence, the district court should have nonetheless followed the applicable state law in construing Jones's sentencing history. Under that construction, Jones asserts, the district court should not have attributed three criminal history points to his criminal history based on the robbery sentence, resulting in a criminal history category of IV rather than V.

Section 4A1.1(a) of the Guidelines advises the court to "[a]dd 3 points [in determining the defendant's criminal history category] for each prior sentence of imprisonment exceeding one year and one month." *See also* U.S.S.G. § 4A1.1(a) cmt. n.1 ("Three points are added for each prior sentence of imprisonment exceeding one year and one month."). In turn, U.S.S.G. § 4A1.2(e)(1) provides:

> Any prior sentence of imprisonment exceeding one year and one month that was imposed within *fifteen years* of the defendant's commencement of the instant offense is counted. Also count any prior sentence of imprisonment exceeding one year and one month, whenever imposed, that resulted in the defendant being incarcerated during any part of such *fifteen-year period*.

(Emphases added.) The issue is whether Jones's incarceration for robbery extended into the 15-year look-back period under § 4A1.2(e)(1).

Here, both parties agree that the instant offense occurred in September 2013; therefore, the relevant look-back period would include September 1998. Jones was paroled from his robbery sentence on May 26, 2000—well within this 15-year look-back period. But Jones objected to the PSR's use of that conviction for criminal history points, arguing that his robbery sentence was discharged on May 26, 1998—not May 26, 2000—because he had to complete his robbery sentence prior to beginning his conspiracy sentence. Because Jones objected to the PSR's attribution of three criminal points to him based on the robbery sentence, the government presented the testimony of the probation officer to prove the necessary facts. *See United States v. Waddell*, 831 F.3d 958, 960–61 (8th Cir. 2016) ("When a defendant objects to facts in a presentence report, a district court may not rely on those facts to sentence the defendant unless the government first proves the facts by a preponderance of the evidence." (citing *United States v. Bowers*, 743 F.3d 1182, 1184 (8th Cir. 2014)). The probation officer testified:

I spoke with a representative of the Iowa Department of Corrections on September 15, 2015, and that representative stated that because the sentencing for the convictions in paragraphs 32 [robbery] and 33 [conspiracy to commit assault] were imposed consecutively, there's not a theoretical discharge date for the robbery conviction in paragraph 32. So the defendant's discharge date for both the robbery and conspiracy to commit assault are May 26 of 2000, the date that he was paroled.

"Courts . . . have looked to state law to define when a state sentence has expired." *United States v. Renfrew*, 957 F.2d 525, 526 (8th Cir. 1992). Iowa law in effect at the time of Jones's March 4, 1997 conspiracy sentencing stated, in relevant part:

If a person is sentenced . . . for a crime committed while confined in a detention facility or penal institution, the sentencing judge shall order the sentence to begin at the expiration of any existing sentence. If the person is presently in the custody of the director of the Iowa department of corrections, the sentence shall be served at the facility or institution in which the person is already confined unless the person is transferred by the director. *If consecutive sentences are specified in the order of commitment, the several terms shall be construed as one continuous term of imprisonment*.

Iowa Code § 901.8 (1995) (emphasis added). In turn, the Iowa statute addressing calculation of sentence reductions in effect at the time of Jones's conspiracy sentencing provided:

903A.7 Separate sentences.

When an inmate is committed under several convictions with consecutive sentences, they shall be construed as *one continuous sentence* in the granting or forfeiting of good conduct time.

Iowa Code § 903A.7 (1995) (emphasis added).

-14-

The statutes in effect at the time of Jones's conspiracy sentencing[4] make clear, consistent with the probation officer's testimony and the IDOC documents, that Jones's consecutive sentences for robbery and conspiracy constituted one continuous term of imprisonment. Therefore, he was not paroled from his robbery sentence until May 26, 2000. This date falls within the 15-year look-back period of U.S.S.G. § 4A1.2(e). As a result, we hold that the district court correctly calculated Jones's criminal history category by attributing three criminal history points to his prior state robbery sentence.

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____

---

[4]Sections 901.8 and 903A.7 were both amended on May 7, 1997, *after* Jones's March 4, 1997 conspiracy sentencing.