RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0096p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

>    *Plaintiff-Appellee*,

*v.*

LEONEL MILLER HINOJOSA, JR. aka Leon Hinojosa,

>    *Defendant-Appellant*.

Nos. 22-1044/1045

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:19-cr-00279-1—Janet T. Neff, District Judge.

Decided and Filed:  May 5, 2023

Before:  SUTTON, Chief Judge; BATCHELDER and MURPHY, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:**  Scott Graham, SCOTT GRAHAM, PLLC, Portage, Michigan, for Appellant. Davin M. Reust, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

_____

## OPINION

_____

MURPHY, Circuit Judge.  While on supervised release for a 2012 felon-in-possession conviction, Leonel Hinojosa shot a man and robbed the man's companion of drugs and money. The federal government charged Hinojosa with a fresh set of crimes for this misconduct.  A jury convicted him of three offenses, and a district court sentenced him to 240 months' imprisonment. The court separately revoked Hinojosa's supervised release and imposed a consecutive 24-month sentence for his 2012 offense.  In these consolidated appeals, Hinojosa challenges his

convictions and sentences. We affirm his convictions and the 24-month sentence for his supervised-release violations. But the district court applied the wrong law when calculating Hinojosa's guidelines range for his new offenses. So we vacate his 240-month sentence and remand for resentencing.

I

On January 18, 2012, police officers were patrolling a high-crime area in Kalamazoo, Michigan. *See United States v. Hinojosa*, 534 F. App'x 468, 469 (6th Cir. 2013). They spotted Hinojosa engaging in suspicious activity, arrested him for driving on a suspended license, and found a gun in his waistband. *See id.* A district court sentenced Hinojosa to 60 months in prison and 3 years of supervised release for possessing a firearm as a felon, in violation of 18 U.S.C. 922(g)(1). In June 2016, the federal government placed Hinojosa on supervised release in Kalamazoo.

Hinojosa flouted the terms of his release. Among other things, he used drugs, drove while intoxicated, and lied to a probation officer. He received modest sanctions for these violations, including several weekend jail confinements.

As Hinojosa spent one of these weekends in jail, a stolen handgun was found in the vehicle that he had parked in the jail's parking lot. The court revoked his supervised release. It sentenced him to the time that he had already served for this misconduct plus two more years of supervised release.

Months later, Hinojosa tested positive for methamphetamine. The court imposed more weekends of jail confinement as a result. Hinojosa appealed. We affirmed the district court's decision. *United States v. Hinojosa*, No. 18-2421, slip op. at 5 (6th Cir. May 20, 2019) (order).

While we considered Hinojosa's prior appeal, he committed the crimes at issue in this one. On January 23, 2019, Jody Stamp asked Hinojosa for a ride to Ashley Stapler's apartment so that he could buy drugs from her. Stamp Tr., R.139, PageID 904–06. Hinojosa agreed. *Id.*, PageID 904. Stamp took a BB gun and Hinojosa took a handgun. *Id.*, PageID 909. Two other men—Terrell Mann and Deon Bradford—were also at Stapler's apartment. *Id.*, PageID 912;

Bradford Tr., R.139, PageID 953. Stapler invited Stamp to use methamphetamine while they negotiated a drug deal. Stamp Tr., R.139, PageID 913; Stapler Tr., R.140, PageID 1075. Meanwhile, Hinojosa started arguing with Bradford about "[w]ho could get a cheaper ounce of meth." Stamp Tr., R.139, PageID 915. After Bradford got up and refused to sit down, Hinojosa suddenly shot him in the leg. *Id.*, PageID 915–16; Bradford Tr., R.139, PageID 957–59; Stapler Tr., R.140, PageID 1080–81; Mann Tr., R.140, PageID 1110–11. Hinojosa then directed Stamp to "grab the bag" of Stapler's drugs. Stamp Tr., R.139, PageID 917. Hinojosa and Stamp left with the bag and later shared its contents: about two ounces of methamphetamine and $500 in cash. *Id.*, PageID 918.

Hinojosa got into a second confrontation on April 17. After participating in a "road rage incident," he followed the other driver to a Lee's Famous Recipe Chicken. Oliver Tr., R.140, PageID 1202; Howe Tr., R.140, PageID 1210–1219. Police were called when Hinojosa used his vehicle to block the drive into and out of this fast-food restaurant. Howe Tr., R.140, PageID 1210–11. An officer ordered Hinojosa to leave in one direction and the second driver to leave in another. *Id.*, PageID 1212–13. But Hinojosa circled back and followed the other driver, who was taking a friend home. Brown Tr., R.142, PageID 1261. Worried about what Hinojosa might do, this driver stopped outside an acquaintance's house (rather than his friend's). *Id.*, PageID 1261–62. Hinojosa pulled up behind the driver, and the two exchanged words. *Id.* That night, someone shot into the acquaintance's house. Oliver Tr., R.140, PageID 1197–1200. Officers questioned Hinojosa, who admitted to tailing the other driver and traveling in the area of the shooting. *Id.*, PageID 1201–03. An expert also opined that the shell casings recovered from the house came from the same gun as the casing recovered when Hinojosa shot Bradford. Crump Tr., R.142, PageID 1331–39.

For these two incidents, the government charged Hinojosa with five new offenses. Its first four counts concerned the events of January 23. The government charged Hinojosa with robbing Stapler of drugs and drug proceeds in violation of the Hobbs Act, 18 U.S.C. § 1951. It also charged him with possessing methamphetamine with the intent to distribute it, in violation of 21 U.S.C. § 841(a)(1); discharging a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii); and possessing ammunition as a felon, in violation of 18 U.S.C.

§ 922(g)(1).  The fifth count concerned the events of April 17.  It charged Hinojosa with another count of possessing ammunition as a felon, in violation of 18 U.S.C. § 922(g)(1).

Before trial, Hinojosa moved to exclude the expert's opinion that the shell casings from the January 23 and April 17 incidents came from the same gun.  Hinojosa argued that the opinion was unreliable under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  The district court found his motion untimely and meritless.

The court held a five-day trial.  At the close of the government's case, Hinojosa moved for a judgment of acquittal.  The court denied the motion as to the four counts about the January 23 events.  But it acquitted Hinojosa of the fifth (felon-in-possession) count about the April 17 events.  Despite the government's evidence that the same firearm had been used in both shootings, the court held that the jury would have to engage in too much speculation to find that Hinojosa shot at the acquaintance's home.  The jury later found Hinojosa guilty of three of the four counts concerning the January 23 events.  It convicted him of Hobbs Act robbery, discharging a firearm during that robbery, and being a felon in possession of ammunition.  But it acquitted him of possessing methamphetamine with the intent to distribute it.

The district court sentenced Hinojosa to a total of 240 months' imprisonment for these three new convictions.  It imposed two 120-month terms on the robbery and felon-in-possession counts that ran concurrently with each other.  It next imposed a third 120-month term on the count of discharging a firearm during a crime of violence, but it ordered this sentence to run consecutively to the other two.

While Hinojosa's new criminal proceedings progressed, his probation officer separately charged Hinojosa with violating the terms of his supervised release for his felon-in-possession conviction from 2012.  At a hearing in this older criminal case, the district court found that Hinojosa had violated his supervised-release terms by committing the crimes of which the jury found him guilty.  The court sentenced him to another 24 months' imprisonment to run consecutively to the 240-month term that it had imposed for his three new convictions.

II

Hinojosa now challenges his convictions, supervised-release revocation, and sentences.

A.  Convictions and Supervised-Release Revocation

Hinojosa attacks his convictions and supervised-release revocation on four grounds.  He argues that the government (1) violated the Speedy Trial Act; (2) did not produce sufficient evidence at trial; (3) wrongly introduced expert testimony at trial; and (4) relied on theories at his supervised-release hearing that conflicted with the trial's outcome.  We disagree on all fronts.

1. *Speedy Trial Act*. Hinojosa first raises a claim under the Speedy Trial Act. U.S. Marshals arrested him in May 2019.  But a grand jury did not indict him until that November.  Hinojosa alleges that the six-month gap between his arrest and indictment violated 18 U.S.C. § 3161(b) because that provision required the government to indict him within 30 days of his arrest.  He misreads the provision.  Its 30-day clock did not apply here because Hinojosa's arrest was based on his alleged *violations of the terms of his supervised release*, not on the *federal charges in his indictment*.

We start with § 3161(b)'s text.  It provides: "Any information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges." 18 U.S.C. § 3161(b).  This language does not trigger the 30-day clock for just any arrest no matter the underlying reason for it.  Rather, the language triggers that clock only for an arrest that is "in connection with such charges." *Id.*  Which charges?  The use of the adjective "such" points back to the specific charges that the statute "previously" referred to—the federal charges listed in the information or indictment.  *Webster's New International Dictionary of the English Language* 2518 (2d ed. 1934).  This reading forecloses Hinojosa's claim here because all agree that his May 2019 arrest was based not on those federal charges, but on his alleged supervised-release violations.

To be sure, an arrest only need be "in connection with" the federal charges in an indictment under § 3161(b).  And the Supreme Court has recognized that this phrase has an

"indeterminat[e]" (and potentially limitless) reach. *Maracich v. Spears*, 570 U.S. 48, 59 (2013) (citation omitted); *see Mont v. United States*, 139 S. Ct. 1826, 1832 (2019). Hinojosa thus argues that an earlier arrest has the required "connection" to later charges in an indictment whenever the arrest and the charges stem from the "same set" of facts. *See United States v. Giwa*, 831 F.2d 538, 540 (5th Cir. 1987).

But the Supreme Court has also made clear that we must identify a "limiting principle" for the phrase "in connection with" that best fits the statutory context and structure. *Maracich*, 570 U.S. at 60. Here, the statute naturally conveys that its 30-day clock begins to run only if the federal charges in the indictment provide the grounds for the defendant's arrest. A "charge" is a "formal accusation of a crime as a preliminary step to prosecution[.]" *Black's Law Dictionary* 227 (7th ed. 1999). And just because an arrest has a "connection with" the factual conduct underlying a crime does not mean that it has a "connection with" the formal accusation in an indictment. Suppose, for example, that state police arrest a defendant for conduct that they allege violates state law. Suppose further that a federal prosecutor decides to charge the defendant with federal crimes only months later. No ordinary person would say that the state police arrested the defendant "in connection with" the federal charges. At the time of the arrest, the federal prosecutor had yet to decide whether to pursue a criminal case, let alone file any "formal accusation" of federal crimes.

The Act's structure confirms this reading. *See Maracich*, 570 U.S. at 60. It offers a remedy for violations of § 3161(b) only to defendants "against whom a [preindictment] complaint [was] filed charging [them] with an offense": "If, in the case of any individual against whom a complaint is filed charging such individual with an offense, no indictment or information is filed within the time limit required by section 3161(b) . . . , such charge against that individual contained in such complaint shall be dismissed or otherwise dropped." 18 U.S.C. § 3162(a)(1). This text provides no remedy if the federal government does not file a complaint against a defendant. *See United States v. Graef*, 31 F.3d 362, 363–64 (6th Cir. 1994); *see also United States v. Mills*, 964 F.2d 1186, 1188–89 (D.C. Cir. 1992) (en banc) (citing cases). On Hinojosa's reading, then, a delay between a supervised-release arrest and an indictment would violate § 3161(b), but the court could grant no relief under § 3162(a)(1) because the arrest would

not be tied to charges in a federal complaint. Rather than read the Act to create a remediless violation, we read its substantive protection to match its remedy by applying only if the indictment's federal charges provided the basis for the arrest. And here, the government had no need to issue a federal complaint because it had already detained Hinojosa for his distinct supervised-release violations.

Precedent interpreting § 3161(b) also confirms this reading. We have repeatedly held that an arrest on state charges does not trigger the 30-day clock for a federal indictment even if federal officials cooperated with the state police in investigating the defendant. *See United States v. Blackmon*, 874 F.2d 378, 381–82 (6th Cir. 1989); *see also, e.g.*, *United States v. Jackson*, 425 F. App'x 476, 482 (6th Cir. 2011); *United States v. Jemison*, 310 F. App'x 866, 872–73 (6th Cir. 2009); *United States v. Legette-Bey*, 147 F. App'x 474, 486–87 (6th Cir. 2005). Contrary to Hinojosa's argument, we have made no exception to this rule even when the defendant's federal and state offenses both "related" to the same conduct. *Legette-Bey*, 147 F. App'x at 487.

Even more relevant, other courts have held that a defendant's arrest for a violation of a supervised-release condition does not trigger the 30-day clock to file an indictment charging new federal offenses even when both involve "the same underlying conduct[.]" *United States v. Contreras*, 63 F.3d 852, 855 (9th Cir. 1995); *see United States v. Keel*, 254 F. App'x 759, 761 (11th Cir. 2007) (per curiam); *United States v. Patterson*, 135 F. App'x 469, 473–74 (2d Cir. 2005) (order); *see also Acha v. United States*, 910 F.2d 28, 30–31 (1st Cir. 1990) (per curiam); *United States v. Stead*, 745 F.2d 1170, 1173 (8th Cir. 1984). We now join these circuits.

One last point. At times, Hinojosa's opening brief suggested that the delay between his arrest and indictment violated the Constitution too. But his cursory statements did not suffice to preserve any constitutional claim. *See United States v. Johnson*, 440 F.3d 832, 846 (6th Cir. 2006).

2. *Sufficiency of the Evidence*. Hinojosa next argues that the government failed to produce enough evidence to convict him. To overturn a jury verdict on this ground, Hinojosa must meet a "demanding" test. *United States v. Potter*, 927 F.3d 446, 453 (6th Cir. 2019). He

must show that no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  When applying this test, moreover, we must resolve any evidentiary conflicts or credibility disputes in a manner that favors the government's version of the facts. *See United States v. Maya*, 966 F.3d 493, 499 (6th Cir. 2020); *United States v. Henley*, 360 F.3d 509, 514 (6th Cir. 2004).

Because a sufficiency challenge disputes whether the government proved an offense's "essential elements," this type of challenge starts with an identification of the offense's elements. *Potter*, 927 F.3d at 453.  Here, the jury found that Hinojosa committed three offenses on January 23, 2019.  It convicted him of robbing Stapler in violation of the Hobbs Act, *see* 18 U.S.C. § 1951(a); of discharging a firearm during a "crime of violence," *see id.* § 924(c)(1)(A)(iii); and of being a felon in possession of ammunition, *see id.* § 922(g)(1).  Hinojosa, though, barely identifies any of the elements of any of these offenses.  He instead raises a generic challenge to all three offenses and a specific challenge to a single element of one of them.

As a general matter, Hinojosa suggests that the government presented insufficient evidence of the basic conduct underlying all of the offenses: that he shot Bradford and stole drugs and drug proceeds from Stapler.  Yet the government's evidence proving this conduct "is more accurately described as 'overwhelming' than 'insufficient.'" *United States v. Kaiser*, 2022 WL 17547516, at *6 (6th Cir. Dec. 9, 2022).  Though their accounts varied in some details, three witnesses—Stamp, Stapler, and Mann—unequivocally testified that Hinojosa shot Bradford and demanded Stapler's bag.  Stamp Tr., R.139, PageID 913–18; Stapler Tr., R.140, PageID 1076–82; Mann Tr., R.140, PageID 1108–16.  And although Bradford could not identify Hinojosa as the shooter, he too testified that he saw two men in Stapler's apartment and that the one wearing black shot him.  Bradford Tr., R.139, PageID 955–59.  His description of the shooter's clothes matched what the other witnesses identified Hinojosa as wearing.  *Compare id.*, PageID 956–57, *with* Stamp Tr., R.139, PageID 909; Stapler Tr., R.140, PageID 1075; Mann Tr., R.140, PageID 1109.

In response, Hinojosa argues that these witnesses lacked credibility.  Stamp, for example, had a motive to minimize his liability because he took part in the robbery.  Likewise, Stapler had a motive to cooperate because of pending state drug charges against her.  But this credibility

argument runs headlong into our standard of review. Our duty to interpret the evidence in the government's favor means that we must assume that the jury accepted the credibility of these witnesses. *See Maya*, 966 F.3d at 503–04. So even if "powerful" reasons existed to question their credibility, the prerogative to resolve that credibility dispute belonged to the jury alone. *Henley*, 360 F.3d at 514. In that respect, Hinojosa's counsel highlighted the credibility concerns for the jury. In opening statements, counsel described the case as about "how witnesses steeped in the drug culture can lie and manipulate the system to save themselves an incredible amount of incarceration." Tr., R.139, PageID 899. Counsel also cross-examined the witnesses about their potential biases and memory lapses. That the jury nevertheless rejected Hinojosa's credibility arguments gives us no basis to reject its verdict.

Hinojosa counters that we can overturn a jury verdict on credibility grounds if a witness's testimony is "facially insubstantial or incredible." *United States v. McCaleb*, 302 F. App'x 410, 414 (6th Cir. 2008) (quoting *United States v. Welch*, 97 F.3d 142, 151 (6th Cir. 1996)). Yet *McCaleb* and *Welch* used this "facially insubstantial" language in dicta. *McCaleb* rejected a sufficiency challenge tied to witness credibility, explaining that we could not ignore testimony favoring the government simply because it was "self-serving" or "contradicted" by other evidence. 302 F. App'x at 414. *Welch* likewise found it "irrelevant" to the sufficiency-of-the-evidence inquiry that witnesses had agreed to cooperate with the government. 97 F.3d at 149. We thus doubt that any "facially insubstantial" exception exists to our usual rule that we cannot evaluate witness credibility at this stage. *See Henley*, 360 F.3d at 514. In all events, the four witnesses' accounts in Hinojosa's case were anything but "facially insubstantial or incredible."

As a specific matter, Hinojosa asserts that the government failed to establish the commerce element necessary for Hobbs Act robbery. The Hobbs Act requires the government to prove that a robbery "obstruct[ed], delay[ed], or affect[ed] commerce" within the federal government's "jurisdiction." 18 U.S.C. § 1951(a), (b)(3); *see United States v. Sanders*, 2021 WL 4787226, at *2–3 (6th Cir. Oct. 14, 2021). Given the Supreme Court's expansive interpretation of the Constitution's Commerce Clause, the Court has held that the government can satisfy this commerce element by showing that a defendant "robbed or attempted to rob a drug dealer of drugs or drug proceeds." *Taylor v. United States*, 579 U.S. 301, 303 (2016).

*Taylor*'s reading dooms Hinojosa's sufficiency challenge. The evidence allowed the jury to conclude that Hinojosa knew Stapler was a drug dealer and robbed her of her drugs and drug proceeds. Among other things, Stamp asked Hinojosa to drive to Stapler's apartment so that he could buy drugs from her. Stamp Tr., R.139, PageID 904–06. While they were there, moreover, Stamp attempted to use methamphetamine that Stapler had pulled out of her bag. *Id.*, PageID 913, 917. Stapler also testified that she weighed some methamphetamine in front of everyone and put it into her bag. Stapler Tr., R.140, PageID 1078. She added that she kept her drug proceeds there. *Id.*, PageID 1078–79. Lastly, Hinojosa demanded this bag after he shot Bradford. Stamp Tr., R.139, PageID 917. The jury thus had plenty of evidence to conclude that Hinojosa "knowingly stole or attempted to steal drugs or drug proceeds[.]" *Taylor*, 579 U.S. at 309.

3. *Expert Testimony*. Hinojosa next argues that the district court mistakenly allowed the government's expert to opine to the jury that the same firearm had discharged the shell casings from the January 23 and April 17 shootings. Under Federal Rule of Evidence 702, an expert may opine on an issue only if the opinion is both "relevant" and "reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert*, 509 U.S. at 589). Hinojosa claims that the expert based his testimony on an unreliable method of matching shell casings to firearms developed by the Association of Firearm and Toolmark Examiners. Federal courts have "almost uniformly" disagreed with this reliability argument. *United States v. Brown*, 973 F.3d 667, 704 (7th Cir. 2020) (citation omitted).

But we need not enter this debate. Even assuming that the district court wrongly admitted this evidence, Hinojosa fails to explain how it harmed him. Federal Rule of Criminal Procedure 52(a) requires us to "disregard[]" errors that do not "affect" a defendant's "substantial rights[.]" Our cases have announced slightly different readings of this rule. Some say that the government must give a "fair assurance" that improper evidence did not "substantially sway[]" the jury; others say that the government must show that the evidence did not affect the verdict by a preponderance of the evidence. *See United States v. Dotson*, 2022 WL 6973397, at *6 (6th Cir. Oct. 12, 2022) (quoting *United States v. Kettles*, 970 F.3d 637, 643 (6th Cir. 2020)). Either way, we have routinely found the improper admission of expert testimony harmless. *See United*

*States v. Dukes*, 779 F. App'x 332, 336 (6th Cir. 2019); *United States v. Pearson*, 746 F. App'x 522, 525 (6th Cir. 2018); *United States v. Miner*, 774 F.3d 336, 350 (6th Cir. 2014); *United States v. Lloyd*, 462 F.3d 510, 518 (6th Cir. 2006); *United States v. Montgomery*, 980 F.2d 388, 392 (6th Cir. 1992).

Any error in this case would have been harmless too. For one thing, the government introduced the expert's testimony primarily to prove that Hinojosa was the culprit who shot into the home on April 17. No witnesses saw this shooting. So the government tried to tie it to the gun that many witnesses saw Hinojosa fire on January 23. Before submitting the case to the jury, however, the district court acquitted Hinojosa of the sole count relevant to the April 17 shooting—the fifth (felon-in-possession) count. Thus, as the court told the parties when discussing the jury instructions, the expert's testimony lost most (if not all) of its relevance. Tr., R.142, PageID 1403. For another thing, the government had an "overwhelming" case against Hinojosa for the three counts of which the jury convicted him. *See Dukes*, 779 F. App'x at 336. Each of these counts concerned the earlier January 23 shooting. And, as explained, four individuals provided eyewitness testimony of this shooting. That the same firearm may have been used at some later point was, at most, tangential.

Hinojosa responds that the expert's opinion "hung in the air" at trial and affected the jury's verdict on all counts by "link[ing]" him "to guns in general[.]" Appellant's Br. 38. But this vague speculation does not suffice to resist a harmless-error finding in light of the government's witness-after-witness testimony identifying Hinojosa as the shooter. *See Dukes*, 779 F. App'x at 336.

4. *Supervised-Release Revocation*. Hinojosa lastly challenges the district court's finding that he violated two terms of his supervised release: that he refrain from committing more crimes and that he not possess ammunition. According to Hinojosa, the court acted inconsistently. It acquitted him at trial of possessing ammunition during the April 17 house shooting. But it allegedly relied on that same incident at his supervised-release hearing to find that he committed these supervised-release violations. Hinojosa is mistaken. The petition charging the two violations alleged that Hinojosa possessed ammunition "[b]etween on or about January 23 and April 17, 2019[.]" Pet., 12-cr-47-01, R.167, PageID 647. And the government introduced

sufficient evidence that he possessed (and fired) a gun on January 23. The evidence underlying that separate felon-in-possession conviction alone sufficed to prove both violations.

## B.  Sentences

Hinojosa raises two sentencing claims. He challenges both his 240-month sentence for his three fresh convictions and his 24-month sentence for his supervised-release violations. We find the record too unclear to resolve his first claim but reject his second one.

1. *240-Month Sentence*. Hinojosa initially argues that the district court issued a "procedurally unreasonable sentence" for his new convictions because it used an ineligible prior offense to calculate his guidelines range. *United States v. Riccardi*, 989 F.3d 476, 481 (6th Cir. 2021). Specifically, the court gave Hinojosa three criminal-history points for a 1994 Michigan conviction of assault with intent to do great bodily harm. Sent. Tr., R.204, PageID 1946. Although Hinojosa committed this assault as a minor, the state charged him as an adult because he shot the victim in the head. Rep., R.159, PageID 1631. And a state court sentenced him to an indeterminate sentence of 54 months to 10 years. *Id.* A criminal-history guideline instructs a district court to assign three criminal-history points for a prior juvenile offense if the government tried the defendant as an adult and if the sentence exceeded a year and a month. U.S.S.G. § 4A1.2(d)(1). So Hinojosa does not claim that this type of juvenile conviction is categorically ineligible for criminal-history points. Rather, he argues only that his specific conviction is too old to qualify.

The same guideline lists the "applicable time period" that a court should use when deciding whether to add a prior conviction to a defendant's criminal history. *Id.* § 4A1.2(e). The guideline lays out two paths to count an older offense. It first says: "Any prior sentence of imprisonment exceeding one year and one month that was imposed within fifteen years of the defendant's commencement of the instant offense is counted." *Id.* § 4A1.2(e)(1). It then says: "Also count any prior sentence of imprisonment exceeding one year and one month, whenever imposed, that resulted in the defendant being incarcerated during any part of such fifteen-year period." *Id.*

Here, the district court could not count Hinojosa's 1994 assault conviction under the first path: that the prior court "imposed" the sentence within 15 years of the current offense. Hinojosa committed his current offenses on January 23, 2019. But the state court imposed the prior sentence for his 1994 assault almost 25 years before that date. Rep., R.159, PageID 1631.

The district court thus could count Hinojosa's 1994 assault only under the guideline's second path: that his prior sentence for the assault "resulted in" his "being incarcerated" within 15 years of his current offenses (that is, after January 23, 2004). U.S.S.G. § 4A1.2(e)(1). The court found this path met in a single sentence. It stated "that Mr. Hinojosa was certainly under the jurisdiction of the State of Michigan for the 1994 offense through . . . sometime in May of 2013, but he also apparently served some time in custody in and around that date." Sent. Tr., R.204, PageID 1946. To hold that Hinojosa was under the state's "jurisdiction" in 2013 because of the 1994 assault, the court relied on the testimony of a probation officer with the Michigan Department of Corrections. But this probation officer testified about how Michigan courts would treat Hinojosa's 1994 assault under Michigan law. So the district court equated the *federal guideline's* standards with distinct *state-law* standards for assessing criminal history. Because § 4A1.2(e)(1) does not incorporate those state-law standards, the court's decision to count this prior crime rests on a legal "misinterpretation" of that guideline. *Riccardi*, 989 F.3d at 481.

The probation officer's testimony proves this point. The officer opined that Hinojosa "went to prison in 1994," but his "jurisdiction with the Department of Corrections did not end until" "he got off of parole supervision" on April 22, 2014. Sent. Tr., R.204, PageID 1939. And his last time in prison under the parole board's jurisdiction was May 29, 2013. *Id.*, PageID 1943. To reach this result, the officer testified about two aspects of Michigan sentencing law. On the one hand, the officer first discussed how state courts calculate a defendant's criminal history to determine the guidelines range for *state* offenses. Unlike the *federal* guideline's "15-year gap," Michigan courts use a "ten-year gap." *Id.*, PageID 1939–41. If a defendant's "discharge date" for the defendant's most recent prior conviction was 10 years before the current offense, a state court should include no criminal history in its guidelines calculations. Mich. Comp. Laws § 777.50(2); *see People v. Butler*, 892 N.W.2d 6, 9 (Mich. Ct. App. 2016). If, though, that

discharge date fell within that 10-year period, the court must use the conviction. Mich. Comp. Laws § 777.50(2). The court must next identify the second most recent conviction. If the discharge date for that conviction fell within 10 years from the offense underlying the first most recent conviction, the court must use it too. *Id.* And the court must "repeat" this process until it identifies a 10-year gap in which the defendant committed no crimes while discharged from the state's custody. *Id.* According to the probation officer, the "discharge date" to trigger this 10-year window also does not even begin to run until a defendant is wholly outside the state's supervision, including off of "parole" and not just out of prison "custody." Sent. Tr., R.204, PageID 1940.

On the other hand, the probation officer interchangeably discussed when and how long Michigan's parole board has "jurisdiction" over a prisoner. Mich. Comp. Laws § 791.234; Sent. Tr., R.204, PageID 1944. The parole board's jurisdiction begins once the prisoner has served the minimum term of imprisonment (at which point the prisoner becomes parole eligible). *See* Mich. Comp. Laws § 791.234(1). But when a defendant receives consecutive sentences for different offenses (whether at the same time or different times), the parole board gets "jurisdiction" only after the defendant has served the "total time of the added minimum terms" for both offenses. *Id.* § 791.234(3). And a "discharge" of the defendant from the parole board's jurisdiction cannot occur until the defendant has served the combined "maximum terms" for these sentences, "unless the prisoner is paroled and discharged upon satisfactory completion of the parole." *Id.*

Both aspects of Michigan law set rules different from the rules in the applicable federal guideline. If, for example, state prosecutors had charged Hinojosa with his current crimes, state courts may well have used the 1994 assault to calculate Hinojosa's criminal history under Michigan's unique 10-year-gap rule. But that fact says nothing about whether the 1994 sentence for this assault "resulted in [Hinojosa's] being incarcerated" within 15 years of his current offenses under U.S.S.G. § 4A1.2(e)(1). Indeed, the probation officer conceded on cross-examination that Michigan's scoring system does not "have anything to do with whether [Hinojosa has] completed his imprisonment" for the 1994 assault. Sent. Tr., R.204, PageID 1941. Likewise, Michigan law may well have given its parole board "jurisdiction" over Hinojosa on a continuous basis between his 1994 assault conviction and his discharge from state

custody in 2013.  But again, that fact does not mean that Hinojosa's 1994 sentence for his assault "resulted in" his incarceration for any time between 2004 and 2013.  U.S.S.G. § 4A1.2(e)(1).  In short, the district court committed legal error because it did not apply the guideline's governing legal test to decide whether Hinojosa's prior 1994 assault conviction should count in his criminal history.

In response, the government rightly recognizes that Michigan sentencing law can help determine—*as a matter of historical fact*—how Hinojosa's 1994 conviction affected his state incarceration.  *See United States v. Jones*, 662 F. App'x 486, 494 (8th Cir. 2016) (quoting *United States v. Renfrew*, 957 F.2d 525, 526 (8th Cir. 1992)); *see also United States v. Redmond*, 418 F. App'x 403, 404–05 (6th Cir. 2011).  But neither Michigan's method of computing criminal history nor the jurisdiction of its parole board can replace § 4A1.2(e)(1)'s legal test for counting prior offenses.  And the district court erred here because it never applied that federal test; it relied on the 1994 conviction because Michigan courts would rely on it under that state's distinct tests.

The government next counters that the district court properly applied § 4A1.2(e)(1) and merely made a "factual" finding that Hinojosa had been imprisoned for the 1994 assault in 2013.  Appellee's Br. 49.  The government is correct that we must review the court's factual findings for clear error.  *United States v. Reid*, 751 F.3d 763, 768–69 (6th Cir. 2014).  But it is incorrect that the court relied on such factual findings.  Its barebones conclusion—when combined with its reliance solely on the probation officer—leaves no doubt that it adopted the probation officer's legal approach.  And that approach rested on Michigan law, not § 4A1.2(e)(1).  Besides, the government's careless analysis in support of this argument would not even survive clear-error review.  When describing Hinojosa's incarceration history, the government asserts that Michigan's parole board revoked his parole in 2009 and that he "was next released from a Michigan prison on May 29, 2013."  Appellee's Br. 49.  If so, how could officers have discovered him with a gun on the streets of Kalamazoo in 2012?  *Hinojosa*, 534 F. App'x at 469.  That discovery led to his 2012 federal felon-in-possession conviction and occurred when he was *not* in a Michigan prison.

Alternatively, the government suggests that we may affirm on different grounds. It suggests that Hinojosa was incarcerated based on the 1994 assault conviction at several earlier points after January 23, 2004 (the critical date for § 4A1.2(e)(1)'s 15-year lookback period). But the parties' briefing and the district court's factual findings do not suffice to resolve the government's alternative arguments now. As a legal matter, the parties spend little time describing what it takes for a prior sentence to have "resulted in" incarceration at a particular time within the meaning of § 4A1.2(e)(1). Under the usual meaning of that phrase, a prior sentence must "bring about" or "cause" the incarceration. *McGraw Hill's Dictionary of American Idioms and Phrasal Verbs* 560 (Richard A. Spears, ed., 2004). And the Supreme Court often reads this type of causation text as incorporating the traditional tort element of but-for causation. *See Burrage v. United States*, 571 U.S. 204, 210–11 (2014) ("results from"); *see also Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) ("because of"); *Holmes v. Secs. Inv. Prot. Corp.*, 503 U.S. 258, 265–66 (1992) ("by reason of"). Should this but-for test apply here? Or should another legal test apply? The district court should address these legal questions on remand.

As a factual matter, the record lacks clarity over how the 1994 assault affected Hinojosa's incarcerations after 2002. In 1994, a state court imposed a sentence of 54 months to 10 years for this offense (less 192 days' credit). Judgment, R.159, PageID 1647. The parole board paroled Hinojosa in 2000. State PSR, R.159, PageID 1631. The next year, however, Hinojosa hit a coworker with a hammer and fractured his skull. Rep., R.159, PageID 1629. In 2002, a state court convicted him of another assault and imposed a sentence of 57 months to 10 years. Judgment, R.159, PageID 1635. Before this 2002 sentence could start to run under Michigan law, Hinojosa needed to serve the minimum term of his 1994 sentence plus any remainder that the parole board added. Mich. Comp. Laws § 768.7a(2); *Wayne Cnty. Prosecutor v. Dep't of Corrs.*, 548 N.W.2d 900, 901–02 (Mich. 1996).

But we do not know when Hinojosa's 1994 sentence ended and when his 2002 sentence began. The government cites no document showing that the parole board revoked parole for the 1994 assault and imposed additional prison time for that offense. To the contrary, a probation officer's parole violation report from 2002 notes that Hinojosa returned to prison on the 2002

conviction and that the officer would "close interest with this report"—suggesting that the board took no action on the 1994 crime. Rep., R.159, PageID 1621. Under Michigan law, moreover, the board could "terminate" Hinojosa's 1994 sentence when he received his 2002 sentence so long as Hinojosa had served the minimum term of the 1994 sentence. Mich. Comp. Laws § 791.234(5). Did the parole board invoke this provision here? We do not know. Other evidence could point the other way. A later parole eligibility report from 2006 lists the 1994 offense as "active." Rep., R.159, PageID 1618. That might suggest that the 1994 conviction still provided a basis for his incarceration. Or it might suggest only that the parole board still had "jurisdiction" over Hinojosa based on that conviction. Mich. Comp. Laws § 791.234. All told, the district court on remand should address the proper legal test and make the proper factual findings.

2. *24-Month Sentence*. In his felon-in-possession case from 2012, Hinojosa argues that the district court unreasonably ordered his 24-month revocation sentence to run consecutively to his 240-month sentence for his three new crimes. The relevant guidelines generally recommend that district courts impose consecutive sentences for supervised-release violations when, as in Hinojosa's case, the conduct underlying those violations produced fresh criminal convictions. *See* U.S.S.G. §§ 5G1.3(d) & cmt. n.4(C), 7B1.3(f) & cmt. n.4; *see also United States v. Massey*, 758 F. App'x 455, 467 (6th Cir. 2018). This recommendation follows from the nature of the punishment for a supervised-release violation. It does not qualify as punishment for the underlying crimes but for a defendant's "breach of the court's trust" when permitting the defendant's release from prison. *United States v. Robinson*, 63 F.4th 530, 537 (6th Cir. 2023).

We see no error in the district court's decision to follow this recommendation in Hinojosa's case. The court only needed to "make generally clear" its reason for choosing to run his sentence for the supervised-release violations consecutively. *United States v. Sears*, 32 F.4th 569, 576 (6th Cir. 2022) (citation omitted). It did so, emphasizing Hinojosa's "pretty dismal" history of violating his terms of supervised release. Sent. Tr., 12-cr-47-01, R.186, PageID 686. If anything, the court understated things. Hinojosa has consistently refused to follow not only the conditions of his parole from his state convictions but also the terms of his supervised release

from his 2012 federal felon-in-possession conviction.  His significant and repeated breaches of the court's trust more than justified its decision to impose a consecutive sentence.

* * *

We affirm Hinojosa's conviction, supervised-release revocation, and sentence for his supervised-release violations.  But we vacate his 240-month sentence for his new criminal convictions and remand for resentencing on those convictions.